**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:20-cv-3255

JOHN SNYDER,

      Plaintiffs,

v.

BEAM TECHNOLOGIES, INC.,

      Defendant.

---

## COMPLAINT AND JURY DEMAND

---

Plaintiff, John Snyder, by and through his attorneys at KONTNIK | COHEN, LLC, files this *Complaint and Jury Demand* against Defendant, Beam Technologies, Inc. ("Beam" or the "Company"), and states as follows:

## I.    <u>INTRODUCTION</u>

1.    Beam lured John Snyder from Arizona to Colorado to work for the Company; misappropriated Mr. Snyder's trade secrets, then fired him less than three months later – under the guise of "not meeting sales goals."

2.    Beam is a dental start-up company, which was founded in 2012, selling Bluetooth-connected toothbrushes, which track and upload users' brushing habits. In 2015, Beam began selling dental insurance that measures risk via brushing data from its toothbrushes. In August of 2018, Beam hired Mr. Snyder. Mr. Snyder possessed trade secrets containing key market and sales data about insurance brokers for every major market in the United States, which Mr. Snyder used throughout his career in insurance carrier benefits, starting in 1990. After

1

misappropriating Mr. Snyder's trade secrets and then firing Mr. Snyder in November 2018—three months after he was hired—Beam hired many sales representatives and had a record setting year for its sales revenue. Then, in May 2019, Beam received fifty-five million dollars ($55,000,000.00) in venture capital funding from Georgian Partners.

3.        Beam's deceptive conduct gives rise to actionable claims under federal and state law. *See* Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq*.; Colorado Uniform Trade Secrets Act, C.R.S. § 7-74-101, *et seq*.; Obtaining Workmen by Misrepresentation, C.R.S. § 8-2-104; Conversion, Colorado common law; Fraudulent Misrepresentation, Colorado common law; Negligent Misrepresentation, Colorado common law; and Promissory Estoppel, Colorado common law.

## II.        PARTIES

4.        Plaintiff, John Snyder has been a resident of the State of Colorado since September 2018 when he relocated from Arizona to Colorado to work for Beam.

5.        Defendant, Beam Technologies, Inc., is not registered to do business in the State of Colorado. Beam Technologies, Inc. is a Delaware Corporation with its principal office at 226 North 5th Street, 4th Floor, Columbus, Ohio 43215.

6.        Beam employed Mr. Snyder as a Regional Director of Broker Success in Highlands Ranch, Colorado from approximately August 6, 2018 until November 16, 2018.

## III.        JURISDICTION AND VENUE

7.        This action arises under the laws of the United States, exceeds seventy-five thousand dollars ($75,000), and includes citizens and companies in different states. Jurisdiction

is conferred upon this Court under 18 U.S.C. § 1836(c) and 28 U.S.C. § 1331 for the federal law claim, and 28 U.S.C. §§ 1332 and 1367 for the state law claims.

8.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because the events giving rise to these claims occurred in the District of Colorado.

## IV.    FACTUAL ALLEGATIONS

### MR. SNYDER

9.      Mr. Snyder developed specialized skills, knowledge, relationships, and expertise in insurance carrier benefits throughout his career, dating back to 1990.

10.     From approximately July of 1990 to January of 1996, Mr. Snyder was the District Sales Manager for John Alden Life Insurance Company, and was based out of St. Louis, Missouri; Phoenix, Arizona; and Denver, Colorado.

11.     From approximately January of 1996 to August of 1998, Mr. Snyder was the National Marketing and Sales Director of United HealthCare Corporation, and was based out of Denver, Colorado.

12.     From approximately August of 1998 to January of 2000, Mr. Snyder was the Vice President of Sales of Community Health Plan of the Rockies, and was based out of Denver, Colorado.

13.     From approximately January 2000 to July of 2001, Mr. Snyder was the Regional Sales Manager for Humana Dental, and based out of St. Louis, Missouri.

14.     From approximately July 2001 to September of 2002, Mr. Snyder was the Regional Territory Manager for Ameritas Group Dental, and based out of Denver, Colorado.

15.    From approximately September of 2002 to October of 2004, Mr. Snyder worked as the Regional Sales Director for Compbenefits Corporation, and was based out of St. Louis, Missouri.

16.    From approximately October 2004 to December of 2006, Mr. Snyder was an independent contractor and worked with individual brokers to evaluate their businesses and identify growth opportunities, and was based out of St. Louis, Missouri.

17.    From approximately December of 2006 to September of 2016, Mr. Snyder was a Group Sales Representative and Territory Manager for Guardian Life Insurance Company ("Guardian"), and was based out of Tempe, Arizona.

18.    Mr. Snyder has also participated in various national insurance underwriter organizations including the National Association of Life Underwriters, the National Association of Health Underwriters, the Colorado Group Insurance Association, the Wyoming Re-Insurance Board of Directors, and the Montana Re-Insurance Board of Directors.

19.    Throughout his career in employee-benefit insurance sales, Mr. Snyder collected and maintained multiple and different types of market reports, client lists, and other proprietary information that he would then use to generate employee-group benefit sales.

TRADE SECRET(S)

20.    Mr. Snyder's trade secrets include multiple spreadsheets (the "Spreadsheets"), which compile detailed and valuable market information about health insurance brokers throughout the United States.

21.    The Spreadsheets contain approximately fourteen thousand forty-four (14,044) kilobyte's ("KB") of data on insurance brokers and companies.

22.     By way of reference, one page of ordinary Roman alphabetic text takes up about two (2) KB's of storage. In comparison, the Spreadsheets contained roughly the equivalent of three thousand five hundred eleven (3,511) pages of information in ordinary Roman alphabetic text about insurance brokers and insurance companies throughout the United States.

23.     Collectively, the Spreadsheets organize individual health insurance brokers and broker companies throughout the United States.

24.     One portion of the Spreadsheets, for example, organizes nearly sixty thousand (60,000) brokers throughout the United States into various categories including, but not limited to, contact information, personal identifying information about the brokers, the broker's assistants, nicknames, and birthdates.

25.     Another portion of the Spreadsheets, for example, organizes brokers into the following categories: AAAAA; AAAA; AAA: AA; A+; A; A-; B; C; D; E; Broker Number; Broker Percentage; Employer Number; Employer Percentage; Employer Average; Number of Insured; Number of Insured Percentage Employees; Employees Percentage; Revenues at Ten Percent; Revenues at Twenty Percent; Revenues at Fourth Percent.

26.     Several other portions of the Spreadsheets contain detailed information and formulas about markets throughout the United States including the potential sales revenues, sales opportunities, and profitability.

27.     Mr. Snyder stored the Spreadsheets on a USB drive and on his home computer.

28.     At all relevant times to this Complaint, Mr. Snyder took reasonable measures to keep the Spreadsheets and the information contained within the Spreadsheets secret.

29.     The Spreadsheets contain compilations of data.

30.    The contents of the Spreadsheets contain economic value because they are not generally known, and because they contain detailed and organized information about markets and brokers throughout the country.

31.    It would take substantial time and money to develop the Spreadsheets.

32.    The contents of the Spreadsheets have been used to help generate millions of dollars in sales in interstate commerce.

33.    The Spreadsheets, and individual portions of the Spreadsheets, contain valuable trade secrets.

<u>BEAM TECHNOLOGIES</u>

34.    Beam was founded in 2012, by Alex Frommeyer, Alex Curry, and Dan Dykes.

35.    Beam developed a smartphone-connected, electric toothbrush.

36.    Beam sells dental insurance.

37.    Individuals with Beam dental insurance receive the Beam toothbrush for free.

38.    Beam's dental insurance measures risk from the data it receives from its toothbrushes.

39.    For the individuals that are part of Beam's group dental insurance, Beam aggregates the data it receives from the individuals and the better the group brushes their teeth, the more money the group can save at the time of the insurance policy renewal.

40.    The insurance sold by Beam is underwritten by National Guardian Life Insurance Company

41.     On August 12, 2014, Defendant received five million dollars ($5,000,000.00) from Drive Capital, a venture capital firm, based out of Columbus, Ohio, as part of its Series A funding.

42.     In 2015, Beam began selling group dental insurance.

43.     In 2015, there were about twenty employees working at Beam.

44.     In 2016, Beam began selling individual dental insurance.

45.     On October 27, 2017, Beam received five million five hundred thousand dollars ($5,500,000.00) from Lewis & Clark Ventures, a venture capital firm, based out of St. Louis, Missouri, as part of its Series B funding.

46.     On May 16, 2018, Beam received twenty-two million five hundred thousand dollars ($22,500,000.00) from Kleiner Perkins, a venture capital firm, based out of Menlo Park, California, as part of its Series C funding.

47.     As of October 22, 2018, Beam was selling dental insurance in twenty-five states.

48.     On May 29, 2019, Defendant received fifty-five million dollars ($55,000,000.00) from Georgian Partners, a venture capital firm, based out of Toronto, Canada, as part of its Series D funding.

49.     As of October of 2020, Beam is selling dental insurance in at least forty states.

50.     Beam's total annual revenue is approximately fifty-one million five hundred thousand dollars ($51,500,000.00).

51.     As of October 2020, there were no less than two hundred thirty-four (234) employees working at Beam.

BEAM'S UNLAWFUL CONDUCT

52.    In the summer of 2018, Mr. Snyder was living in Arizona with his wife and daughter.

53.    On or around the summer of 2018, Mr. Snyder was being actively recruited by several large dental insurance companies including, but not limited to, Benefit Mall, Warner Pacific, PanAmerican Life Insurance, United HealthCare, and Sun Life.

54.    On Saturday, July 14, 2018, Alex Frommeyer, co-Founder and Chief Executive Officer for Beam, initiated contact with Mr. Snyder via LinkedIn.

55.    After exchanging LinkedIn messages, on July 14, 2018, Mr. Frommeyer and Mr. Snyder spoke via telephone.

56.    The July 14, 2018 phone call between Mr. Frommeyer and Mr. Snyder was approximately forty-five (45) minutes.

57.    During the July 14, 2018 call, Mr. Frommeyer explained that Beam was looking for someone with experience in the insurance industry to join the team.

58.    During the July 14, 2018 call, Mr. Frommeyer asked Mr. Snyder about his connections with insurance brokers throughout the country.

59.    During the July 14, 2018 call, Mr. Frommeyer asked Mr. Snyder about his experience in the industry.

60.    During the July 14, 2018 call, Mr. Frommeyer asked Mr. Snyder about his ability to introduce new products to the market.

61.    During the July 14, 2018 call, Mr. Frommeyer and Mr. Snyder discussed a sales strategy for Beam's products.

8

62.     During the July 14, 2018 call, Mr. Snyder explained to Mr. Frommeyer that it would be impossible to generate significant sales in the fourth quarter of 2018 because brokers would be focused on renewing existing business, which constitutes the majority of brokers' income.

63.     During the July 14, 2018 call, Mr. Frommeyer and Mr. Snyder discussed a sales plan that would include introducing and pushing Defendant's product line after January 1, 2019.

64.     During the July 14, 2018 call, Mr. Snyder also provided a general description of the Spreadsheets.

65.     During the July 14, 2018 call, Mr. Snyder explained the general content of the Spreadsheets including that he had an organized list of insurance brokers from every major market in the United States.

66.     During the July 14, 2018 call, Mr. Frommeyer asked Mr. Snyder questions about the Spreadsheets.

67.     During the July 14, 2018 call, Mr. Frommeyer asked Mr. Snyder about the format of the Spreadsheets.

68.      During the July 14, 2018 call, Mr. Frommeyer asked Mr. Snyder whether the Spreadsheets could be uploaded to Salesforce.

69.     During the July 14, 2018 call, Mr. Frommeyer stated to Mr. Snyder that the Defendant would compensate Mr. Snyder for the Spreadsheets.

70.     On Sunday, July 15, 2018, Mr. Frommeyer emailed Mr. Snyder thanking him for connecting and stating, "Beam Dental is the fastest growing dental insurance company ever and we just raised another $25M from Kleiner Perkins to help us scale the business even faster …

[w]ould love to do an initial call with you right away, as we are hiring for our Broker Success Manager role (territory based sales, uncapped quota) really aggressively."

71.     Mr. Snyder responded to the July 15, 2018 email, and Mr. Frommeyer scheduled a call for July 17, 2018.

72.     During the July 17, 2018 call, Mr. Frommeyer stated to Mr. Snyder that Beam was new to the insurance market and needed someone, like Mr. Snyder who can guide Beam through the process of introducing a new product to the market.

73.     During the July 17, 2018 call between Mr. Frommeyer and Mr. Snyder, the Spreadsheets were mentioned.

74.     During the July 17, 2018 call between Mr. Frommeyer and Mr. Snyder, Mr. Frommeyer stated that Beam would compensate Mr. Snyder for the Spreadsheets.

75.     After the July 17, 2018 call, Chris Prochak, the Chief Revenue Officer for Beam, emailed Mr. Snyder to schedule a call between Mr. Snyder and Mr. Prochak for July 19, 2018.

76.     On July 19, 2018, Mr. Prochak and Mr. Snyder spoke over the telephone.

77.     During the July 19, 2018 call, Mr. Prochak and Mr. Snyder discussed the Spreadsheets in general.

78.     On July 20, 2018, Mr. Frommeyer emailed Mr. Snyder and copied Chase McCants, Beam's Head of Talent, and stated, "[I] heard you and Chris had a great chat yesterday … we would love to move quickly here to find a fit!"

79.     In the July 20, 2018 email, Mr. Frommeyer also stated that he would like to have Mr. Snyder fly out to Columbus, Ohio the following week to meet the team, and he would like to schedule another call to "tee up some ideas for the specific role and how it may evolve[.]"

80.     On July 22, 2018, Mr. Snyder confirmed his trip to Columbus and purchased flights to arrive on July 25, 2018.

81.     On July 23, 2018, Mr. McCants emailed Mr. Snyder an itinerary for his scheduled visit. Mr. Snyder was scheduled to meet with Mr. McCants, Mr. Frommeyer, Koby Doughty (Director of Broker Success), and the rest of the executive team at Beam.

82.     On July 25, 2018, Mr. Snyder flew to Columbus for a series of interviews and meetings with Beam's executive team.

83.     On July 26th and 27th of 2018, Mr. Snyder met with Mr. Frommeyer, Mr. McCants, Mr. Doughty, and several members of Beam's customer service team and information technology team.

84.     During the meetings and interviews on July 26th and 27th of 2018, Mr. Snyder explained to Beam's executive team that it would be impossible to generate significant sales in the fourth quarter of 2018 because brokers would be focused on renewing existing business, which constitutes most of the brokers income.

85.     During the meetings and interviews on July 26th and 27th of 2018, Beam agreed that Mr. Snyder was an ideal candidate and to begin generating and pushing sales in January of 2019 using the information contained in the Spreadsheets.

86.     During the meetings and interviews on July 26th and 27th of 2018, Mr. Frommeyer discussed compensating Mr. Snyder for the Spreadsheets.

87.     On July 29, 2018, Mr. Frommeyer emailed Mr. Snyder stating, in relevant part, "I believe Chase is working on references currently, but we are getting quickly ready to make a move and get you on our team to go start producing huge volumes for the 4th quarter."

88.    Mr. Snyder responded to Mr. Frommeyer's July 29, 2018 email and asked to speak as soon as possible.

89.    Shortly after responding to the July 29, 2018 email, Mr. Frommeyer and Mr. Snyder discussed Mr. Snyder's anticipated role with Beam including the plan to begin pushing Beam's products after January 1, 2019.

90.    Between July 29, 2018 and August 2, 2018, Beam's representatives contacted Mr. Snyder's reference, Bob Bartlett, who had approximately thirty years of experience in employee-benefits insurance sales.

91.    Beam's representative and Mr. Bartlett discussed Mr. Snyder's qualifications and specifically discussed Beam's plan to begin pushing sales after January 1, 2019. Mr. Bartlett reiterated that it would be impossible to generate significant sales in the fourth quarter of 2018 because brokers would be focused on locking in existing business for the 2018 calendar year, which constitutes most of the brokers income.

92.    Due to Mr. Snyder's connections in Colorado, Beam decided to relocate Mr. Snyder to Colorado as part its offer to employ Mr. Snyder.

93.    On Wednesday, August 1, 2018, Beam made a formal offer (the "Offer") to Mr. Snyder to join the company as a Regional Director of Broker Success for the Mountain West Region ("Regional Director").

94.    Beam agreed to compensate Mr. Snyder under the terms of the Offer as follows:

a.    A base salary of one hundred sixty thousand dollars ($160,000.00), reverting to one hundred twenty-five thousand dollars ($125,000.00) after twelve (12) months.

b.      Health, Dental, and Vision: One Hundred percent (100%) premiums for employees and dependents, which was valued at approximately fifteen thousand dollars ($15,000.00).

c.      401(k) matching one hundred percent (100%), up to four percent (4%) of gross salary, which was valued at approximately six thousand four hundred dollars ($6,400.00).

d.      A moving allowance of thirty thousand dollars ($30,000).

e.      Bonus opportunity of up to five percent (5%) of base salary, based on team wide targets, which was valued at approximately eight thousand dollars ($8,000).

f.      Two percent (2%) of annualized new logo bookings, on a yearly uncapped OTE ("On Track Earnings") quota of two million five hundred thousand dollars ($2,500,000), which was valued at fifty thousand dollars ($50,000.00) or more.

g.      Initial stock options for five hundred (500) shares.

95.    As of August 1, 2018, when Mr. Snyder received the Offer, Mr. Snyder had not shared any of the specific contents of the Spreadsheets with Beam.

96.    Mr. Snyder relied on the following promises when considering whether to accept Beam's Offer:

a.      Defendant's promise to compensate Mr. Snyder as described in the August 1, 2018 Offer.

    b.    Defendant's promise to compensate Mr. Snyder for the contents of the Spreadsheets.

    c.    Defendant's promise to initiate the roll out of its new product line after January 1, 2019.

97.    Beam knew, at the time it presented the Offer to Mr. Snyder, that it did not intend to honor the terms of the Offer, compensate Mr. Snyder for the Spreadsheets, and conduct a roll-out after January 1, 2019.

98.    On Thursday, August 2, 2018, Mr. Snyder accepted Beam's offer of employment and compensation terms.

99.    Mr. Snyder would not have accepted the Offer if Beam had not promised to compensate Mr. Snyder as detailed in the Offer letter.

100.    Mr. Snyder would not have accepted the Offer if the Beam had not promised to compensate Mr. Snyder for the contents of the Spreadsheets.

101.    Mr. Snyder would not have accepted the Offer if Beam had not promised to roll-out its product line after January 1, 2019.

102.    After Mr. Snyder accepted the Offer, and during the week of August 6, 2018, Beam flew Mr. Snyder to San Diego, California for training.

103.    During the week of August 6, 2018, Beam provided Mr. Snyder with a company computer, company email, and began training Mr. Snyder on the company computer and operating systems.

104.    On August 17, 2018, Beam provided Mr. Snyder with a document that was titled "Relocation Benefits Repayment Agreement" ("Relocation Agreement").

105.    The Relocation Agreement stated that Beam would reimburse Mr. Snyder up to thirty thousand dollars ($30,000.00) to relocate from Arizona to Colorado.

106.    Mr. Snyder relied on the promises made by Beam as detailed in Paragraph 96 above when he accepted and signed the Relocation Agreement.

107.    Mr. Snyder would not have accepted the Relocation Agreement if Beam had not promised to compensate Mr. Snyder as detailed in the Offer letter.

108.    Mr. Snyder would not have accepted the Relocation Agreement if Beam had not promised to compensate Mr. Snyder for the contents of the Spreadsheets.

109.    Mr. Snyder would not have accepted the Relocation Agreement if Beam had not promised to roll-out its product line after January 1, 2019.

110.    Mr. Snyder saved the Spreadsheets on his computer that was provided by Beam.

111.    Mr. Snyder had an expectation of privacy on the computer that was provided by Beam.

112.    Beam never informed Mr. Snyder that they could access the files that Mr. Snyder saved on his work computer.

113.    Mr. Snyder did not share the entire contents of the Spreadsheets with anyone including any of Beam's employees.

114.    During the last two weeks in August of 2018, Mr. Snyder began contacting brokers using the Spreadsheets to inform them of his new employment with Beam.

115.    When contacting brokers during the remainder of August 2018, Mr. Snyder informed brokers of the new product(s) that Beam would be offering and stated to the brokers that Beam would begin pushing their new product(s) after January 1, 2019.

116.    In early September of 2018, Mr. Snyder moved his family from Arizona to Highlands Ranch, Colorado.

117.    Mr. Snyder relied on the promises made by Beam as detailed in Paragraph 96 above when deciding to move his family from Arizona to Colorado.

118.    Mr. Snyder would not have moved to Colorado with his family if the Beam had not promised to compensate Mr. Snyder as detailed in the Offer letter.

119.    Mr. Snyder would not have moved to Colorado with his family if Beam had not promised to compensate Mr. Snyder for the contents of the Spreadsheets.

120.    Mr. Snyder would not have moved to Colorado with his family if Beam had not promised to roll-out its product line after January 1, 2019.

121.    In mid-September 2018, Beam flew Mr. Snyder back to Columbus, Ohio for a series of meetings with Beam's executive team.

122.    The mid-September 2018 meetings with the executive team in Columbus, Ohio, were specifically designed by Beam to develop a sales plan for the post-January 1, 2019 sales push of Beam's products.

123.    During the mid-September 2018 meetings, Mr. Snyder met with several members of Beam's team including, but not limited to, Mr. Prochak, Mr. Doughty, Mr. McCants, Ely Tavera (Lead Generation Manager), Hailey Major (Houston Sales Representative), and Steven Basiakos (Utah Sales Representative).

124.    Mr. Snyder, who was hired as a Regional Director, was scheduled to oversee the sales teams in the Rocky Mountain Region and the western states.

125.     While in Columbus for the mid-September meetings, Mr. Snyder provided Ms. Major and Mr. Basiakos limited information about the Houston and Utah markets. Ms. Major described the information as "gold mine."

126.     While in Columbus for the mid-September 2018 meetings, Mr. Snyder discussed the Spreadsheets in general with Ms. Major, Mr. Basiakos, Mr. Tavera, Mr. Frommeyer, and other members of the executive team.

127.     During the mid-September 2018 meetings, Beam became aware that Mr. Snyder had the Spreadsheets on his Company computer.

128.     During a mid-September meeting with Mr. Prochak, who was aware of the Spreadsheets, Mr. Prochak stated to Mr. Snyder, "you are going to do for this company in weeks what we haven't been able to do in years."

129.     Mr. Snyder did not provide the entire contents of the Spreadsheets to Beam's employees during the mid-September meetings.

130.     During a meeting with Mr. Tavera, however, Mr. Snyder learned that Beam had obtained all the information contained in the Spreadsheets.

131.     During the meeting with Mr. Tavera, Mr. Snyder learned that Beam was already in the process of uploading the contents of the Spreadsheets to Salesforce.

132.     Beam did not obtain Mr. Snyder's permission to access the entire Spreadsheets and upload the Spreadsheets to Salesforce.

133.     Beam knew that it did not have Mr. Snyder's permission to obtain the entire Spreadsheets or upload the Spreadsheets to Salesforce.

134.    Beam knew that Mr. Snyder expected compensation for the contents of the Spreadsheets when it obtained the entire Spreadsheets and uploaded the contents of the Spreadsheets to Salesforce.

135.    Beam knew that it improperly acquired the Spreadsheets from Mr. Snyder.

136.    After Mr. Snyder returned to Colorado from the mid-September meetings, Beam utilized the Spreadsheets to begin sending out a series of email blasts to thousands of brokers including, but not limited to, brokers in Colorado, Arizona, and New Mexico.

137.    Within weeks, Beam received at least one thousand three hundred (1,300) positive responses from individual brokers, many of whom specifically indicated that they loved the material and were interested in engaging in business with Defendant after January 1, 2019.

138.    Prior to October of 2018, Mr. Snyder was scheduled to visit Columbus, Ohio in October 2018 for a teamwide sales meeting and in November 2018 to discuss goals for members of the sales team.

139.    In early October of 2018, shortly after Beam received overwhelming positive responses to the email blasts, Mr. Prochak called Mr. Snyder and indicated that they had established new sales goals ("Goals"), and Mr. Snyder was now individually responsible for obtaining between twenty five (25) and thirty (30) proposals per week and at least one million two hundred fifty thousand dollars ($1,250,000) in annual premiums before the end of 2018.

140.    Mr. Snyder questioned Mr. Prochak about the new Goals because they had never been discussed before, and because Mr. Snyder was hired to, among other responsibilities, help drive and set sales goals for the sales team that he was supposed to manage.

141.    The goals provided by Mr. Prochak also contradicted the plan for a post-January 1, 2019 roll-out.

142.    Beam also informed Mr. Snyder that he was not needed at the October 2018 sales team meeting in Columbus, Ohio.

143.    On November 16, 2018, Mr. McCants called Mr. Snyder on speaker phone with Mr. Prochak.

144.    During the November 16, 2018 call, Mr. Prochak informed Mr. Snyder that Beam was terminating Mr. Snyder as of "today [November 16, 2018]" because he was "not meeting his sales goals."

145.    During the November 16, 2018 call, Mr. McCants indicated to Mr. Snyder that Beam needed Mr. Snyder's computer back immediately, they needed Mr. Snyder's expense reports, that Mr. Snyder would be allowed to stay on his health benefits through the end of the year, and that Mr. Snyder would get one week of severance pay.

146.    Immediately after the November 16, 2018 call, Mr. Snyder attempted to log into his computer, which Beam had provided, but Beam had remotely removed Mr. Snyder's ability to access or use the computer.

147.    After Mr. Snyder was terminated, Beam informed Mr. Snyder that the "Stock Options" it agreed to pay Mr. Snyder were worth "nothing."

148.    After Mr. Snyder was terminated, Beam continued to utilize the Spreadsheets to generate sales throughout the United States.

149.    After Mr. Snyder was terminated, Beam continued to profit from its use of the Spreadsheets.

150.    As a direct and proximate cause of Beam's termination and misrepresentations, Mr. Snyder suffered damages in an amount to be proven at trial.

151.    As a direct and proximate cause of Beam's misappropriation of Mr. Snyder's trade secrets, Mr. Snyder has suffered damages in an amount to be proven at trial.

**V.    CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**
(Defend Trade Secrets Act -18 U.S.C. § 1836)

152.    Mr. Snyder fully incorporates the allegations contained in the preceding paragraphs as if fully set forth herein.

153.    The Spreadsheets are trade secrets because they contain unique information that Mr. Snyder took reasonable measures to keep secret, and the information contained in the Spreadsheets has independent economic value.

154.    Mr. Snyder took reasonable measures to keep the Spreadsheets secret by saving the Spreadsheets on his personal computer, on a USB drive, and in a private file on his work computer.

155.    The Spreadsheets derive independent economic value because the substance and organization of the information contained in the Spreadsheets is not generally known within the industry. Further, the Spreadsheets have been used in the past to generate millions in dollars in sales.

156.    The Spreadsheets, which contain sales information throughout the United States, are designed for use in interstate commerce.

157.    Beam acquired the Spreadsheets from Mr. Snyder without Mr. Snyder's consent.

158.    Beam improperly acquired the Spreadsheets from Mr. Snyder's computer or through other improper means.

159.    Beam knew that Mr. Snyder had not authorized Beam's use of the entire Spreadsheets.

160.    Beam utilized and continues to utilize the Spreadsheets to generate sales and profits for Beam's business.

161.    As a direct and proximate cause of Beam's misappropriation of Mr. Snyder's trade secrets, Mr. Snyder has suffered damages in an amount to be determined at trial.

162.    Mr. Snyder is entitled to relief to the fullest extent permitted by law.

## SECOND CLAIM FOR RELIEF
(Colorado Uniform Trade Secrets Act - C.R.S. §§ 7-74-101, *et seq.*)

163.    Mr. Snyder fully incorporates the allegations contained in the preceding paragraphs as if fully set forth herein.

164.    The Spreadsheets are trade secrets because they contain confidential business information which is secret and of value, and Mr. Snyder took reasonable measures to maintain the secrecy of the Spreadsheets.

165.    Mr. Snyder took reasonable measures to keep the Spreadsheets secret by saving the Spreadsheets on his personal computer, on a USB drive, and in a private file on his work computer.

166.    The Spreadsheets derive independent economic value because the substance and organization of the information contained in the Spreadsheets is not generally known within the industry. The Spreadsheets have been used in the past to generate millions in dollars in sales.

167.    The Spreadsheets, which contain sales information throughout the United States, are designed for the use in commerce.

168.    Beam acquired the Spreadsheets from Mr. Snyder without Mr. Snyder's consent.

169.    Beam improperly acquired the Spreadsheets from Mr. Snyder's computer or through other improper means.

170.    Beam knew that Mr. Snyder had not authorized Beam's use of the entire Spreadsheets.

171.    Beam utilized and continues to utilize the Spreadsheets to generate sales and profits for Beam's business.

172.    As a direct and proximate cause of Beam's misappropriation of Mr. Snyder's trade secrets, Mr. Snyder has suffered damages in an amount to be determined at trial.

173.    Mr. Snyder is entitled to relief to the fullest extent permitted by law.

**THIRD CLAIM FOR RELIEF**
(Obtaining Workmen by Misrepresentation - C.R.S. § 8-2-104)

174.    Mr. Snyder fully incorporates the allegations contained in the preceding paragraphs as if fully set forth herein.

175.    Beam falsely represented to Mr. Snyder that Beam would compensate Mr. Snyder pursuant to the terms of Beam's Offer as described in Paragraph 94 above.

176.    Beam falsely represented to Mr. Snyder that it would roll out its new product line after January 1, 2019.

177.    The foregoing representations contained in Paragraphs 175 and 176 were material with respect to Mr. Snyder's decision to accept employment with Beam.

178.    Beam knew that the foregoing representations contained in Paragraphs 175 and 176 were false at the time Beam made each representation.

179.    Mr. Snyder was unaware that Beam did not intend to honor the representations made in Paragraphs 175 and 176.

180.    Beam made the Representations in Paragraphs 175 and 176 to induce Mr. Snyder to accept employment with Beam and move from Arizona to Colorado to accept employment with Beam.

181.    As a direct and proximate cause of Beam's misrepresentations, Mr. Snyder has suffered damages in an amount to be determined at trial.

182.    Mr. Snyder is entitled to relief to the fullest extent permitted by law.

## FOURTH CLAIM FOR RELIEF
(Conversion - Colorado Common Law)

183.    Mr. Snyder fully incorporates the allegations contained in the preceding paragraphs as if fully set forth herein.

184.    The Spreadsheets belonged to Mr. Snyder and contained valuable information which Mr. Snyder sought to protect.

185.    Beam acquired unauthorized ownership and dominion of the Spreadsheets when it took the Spreadsheets from Mr. Snyder without Mr. Snyder's consent.

186.    Beam knew that Mr. Snyder had not authorized Defendant's ownership or dominion of the entire Spreadsheets.

187.    Beam utilized and continues to utilize the Spreadsheets to generate sales and profits for Beam's business.

188.     As a direct and proximate cause of Beam's conversion of Mr. Snyder's trade secrets, Mr. Snyder has suffered damages in an amount to be determined at trial.

189.     Mr. Snyder is entitled to relief to the fullest extent permitted by law.

## FIFTH CLAIM FOR RELIEF
(Fraudulent Misrepresentation - Colorado Common Law)

190.     Mr. Snyder fully incorporates the allegations contained in the preceding paragraphs as if fully set forth herein.

191.     Beam falsely promised Mr. Snyder that it would compensate him for the Spreadsheets.

192.     The foregoing representation in Paragraph 191 was material with respect to Mr. Snyder's decision to accept employment with Beam and work with Beam to develop a national sales strategy.

193.     Beam knew that the foregoing representation contained in Paragraph 191 was false at the time Beam made each representation.

194.     Mr. Snyder was unaware that Beam did not intend to honor the representation made in Paragraph 191.

195.     Beam made the Representations in Paragraph 191 to induce Mr. Snyder to accept employment with Beam and to gain access to the Spreadsheets from Mr. Snyder.

196.     As a direct and proximate cause of Beam's misrepresentations, Mr. Snyder has suffered damages in an amount to be determined at trial.

197.     Mr. Snyder is entitled to relief to the fullest extent permitted by law.

**SIXTH CLAIM FOR RELIEF**
(Negligent Misrepresentation - Colorado Common Law)

198.    Mr. Snyder fully incorporates the allegations contained in the preceding paragraphs as if fully set forth herein.

199.    During Mr. Snyder's dealings with Beam, Defendant falsely represented to Mr. Snyder that it would compensate him for the contents of his Spreadsheets.

200.    Mr. Snyder accepted employment with Beam based on its representation that it would compensate Mr. Snyder for the content of the Spreadsheets.

201.    Mr. Snyder moved his family from Arizona to Colorado based on Beam's representation that it would compensate him for the contents of the Spreadsheets.

202.    Mr. Snyder was justified relying on Beam's promise to compensate him for the contents of the Spreadsheets.

203.    As a direct and proximate cause of Beam's misrepresentations, Mr. Snyder has suffered damages in an amount to be determined at trial.

204.    Mr. Snyder is entitled to relief to the fullest extent permitted by law.

**SEVENTH CLAIM FOR RELIEF**
(Promissory Estoppel - Colorado Common Law)

205.    Mr. Snyder fully incorporates the allegations contained in the preceding paragraphs as if fully set forth herein.

206.    Beam falsely promised Mr. Snyder that it would roll out its new product line after January 1, 2019.

207.    Beam falsely promised Mr. Snyder that it would compensate him for the Spreadsheets.

208.     Beam falsely promised to compensate Mr. Snyder pursuant to the terms of the Offer letter.

209.     Beam reasonably should have expected that Mr. Snyder would rely on the promises stated in Paragraphs 206 through 208 when accepting employment with Beam and moving his family to from Arizona to Colorado for employment with Beam.

210.     Mr. Snyder reasonably relied on the promises detailed in Paragraphs 206 through 208 when accepting employment with Beam and moving his family from Arizona to Colorado.

211.     Mr. Snyder has acted to his and his family's detriment by accepting employment with Beam and moving to Colorado, and manifest injustice will result if the Beam's promises are not enforced.

212.     As a direct and proximate cause of Beam's false promises, Mr. Snyder has suffered damages in an amount to be determined at trial.

213.     Mr. Snyder is entitled to relief to the fullest extent permitted by law.

## VI.    PRAYER FOR RELIEF

WHEREFORE, Mr. Snyder respectfully requests a trial by jury on all issues so triable, and further requests as follows:

1.     The Court assume jurisdiction.

2.     The Court award Mr. Snyder monetary damages including actual and consequential damages, economic damages, and punitive damages and any other such relief to the maximum extent permitted by law.

3.     The Court award Mr. Snyder his reasonable attorneys' fees and costs to the maximum extent permitted by law.

4.      The Court award Mr. Snyder pre and post judgment interest to the maximum extent permitted by law.

5.      The Court award additional or alternative relief that may be just, proper, appropriate, and equitable under the circumstances.

Dated: October 30, 2020.

KONTNIK | COHEN, LLC


*s/ Spencer J. Kontnik*
Spencer J. Kontnik
Austin M. Cohen
Morgan E. Hamrick
201 Steele Street, Suite 210
Denver, Colorado 80206
Telephone: (720) 449-8448
skontnik@kontnikcohen.com
acohen@kontnikcohen.com
mhamrick@kontnikcohen.com
Attorneys for Plaintiff JOHN SNYDER