**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Nina Y. Wang**

Civil Action No. 20-cv-03255-NYW

JOHN SNYDER,

      Plaintiff,

v.

BEAM TECHNOLOGIES, INC.,

      Defendant.

---

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant's Partial Motion for Summary Judgment (the "Motion" or "Motion for Summary Judgment") [Doc. 98].[1]  The Court *sua sponte* ordered oral argument on the Motion, *see* [Doc. 119], which was held on May 31, 2023.  *See* [Doc. 122].  The Court has reviewed the Parties' briefing, the applicable case law, and the case record, and has considered the Parties' arguments made during the May 31 hearing.  For the reasons set forth below, the Motion for Summary Judgment is respectfully **GRANTED in part** and **DENIED in part**.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A dispute is genuine if there is sufficient evidence so

---

[1] Although styled as a motion for partial summary judgment, Defendant seeks "summary judgment in its favor on all claims."  [Doc. 98 at 1].  Defendant confirmed at oral argument that it seeks judgment in its favor on each of Plaintiff's claims.

that a rational trier of fact could resolve the issue either way.  A fact is material if under the substantive law it is essential to the proper disposition of the claim." *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1194 (10th Cir. 2011) (internal citations and quotation omitted).

"[I]t is not the party opposing summary judgment that has the burden of justifying its claim; the movant must establish the lack of merit." *Alpine Bank v. Hubbell*, 555 F.3d 1097, 1110 (10th Cir. 2009).  In attempting to meet this standard, a movant that does not bear the ultimate burden of persuasion at trial does not need to disprove the other party's claim; rather, the movant must only point the Court to a lack of evidence for the other party on an essential element of that party's claim. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).  Once the movant has met its initial burden, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  To satisfy this burden, the nonmovant must point to competent summary judgment evidence creating a genuine dispute of material fact; conclusory statements based on speculation, conjecture, or subjective belief are insufficient. *See Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004); *see also* 10B Charles Alan Wright et al., Federal Practice and Procedure § 2738 (4th ed. 2022) (explaining that the nonmovant cannot rely on "mere reargument of his case or a denial of an opponent's allegation" to defeat summary judgment).  In considering the evidence, the Court cannot and does not weigh the evidence or determine the credibility of witnesses. *See Fogarty v. Gallegos*, 523 F.3d 1147, 1165 (10th Cir. 2008).  At all times, the Court will "view the factual record and draw all reasonable inferences therefrom most favorably to the nonmovant." *Adler*, 144 F.3d at 670.

## FACTUAL AND PROCEDURAL BACKGROUND

The following facts are drawn from the Parties' briefing and are undisputed unless otherwise noted.[2]  Plaintiff John Snyder ("Plaintiff" or "Mr. Snyder") was employed by Defendant Beam Technologies, Inc. ("Defendant" or "Beam") from August 2018 to November 16, 2018. [Doc. 98 at ¶¶ 23, 26, 29; Doc. 105 at ¶¶ 23, 26, 29; Doc. 98-11 at 20].[3]  Prior to his employment with Beam, Mr. Snyder worked for Guardian Life Insurance Company ("Guardian") from approximately December 2006 to August 2016.  [Doc. 98 at ¶ 1; Doc. 105 at ¶ 1; Doc. 98-2 at 40:14–22;[4] Doc. 99-4 at 2].[5]  On February 19, 2015 at 11:51 A.M., Mr. Snyder downloaded raw sales data from Siebel, Guardian's client-relationship-management ("CRM") software, to a Microsoft Excel spreadsheet titled "Guardian Broker List 2.19.2015.xlsx" ("Spreadsheet Number 4" or the "Guardian Broker List").[6]  [Doc. 98 at ¶¶ 4–5; Doc. 105 at ¶¶ 4–5; Doc. 92; Doc. 98-2 at

---

[2] Mr. Snyder identifies numerous disputes of fact in his "Response and Clarification to Statement of Undisputed Material Facts."  *See* [Doc. 105 at 1–8].  On several occasions, Mr. Snyder only denies a specific portion of a statement of fact asserted by Beam.  When this is the case, the Court accepts the portions that are not objected to or disputed as undisputed without further note from the Court.

[3] While the Parties have numerous disputes about the circumstances of Mr. Snyder's employment with Beam, they do not appear to dispute the dates during which Mr. Snyder was employed by Beam.  *See* [Doc. 98 at ¶¶ 23, 26, 29; Doc. 105 at ¶¶ 23, 26, 29].

[4] When citing to transcripts, the Court cites to the document numbers generated by the CM/ECF system but the page and line numbers generated by the transcript.

[5] While Defendant originally states that Mr. Snyder was employed by Guardian until September 2016, which is not disputed by Plaintiff, [Doc. 98 at ¶ 1; Doc. 105 at ¶ 1], it is undisputed that Mr. Snyder was terminated by Guardian on August 1, 2016, which is supported by the submitted evidence.  *See* [Doc. 98 at ¶ 12; Doc. 105 at ¶ 12; Doc. 99-4 at 2; Doc. 98-2 at 40:21–25].

[6] This case revolves around a number of spreadsheets.  Throughout this litigation, Mr. Snyder has consistently referred to these spreadsheets by numerical designation.  *See, e.g.*, [Doc. 23 at ¶¶ 22–31, 193–94; Doc. 36 at 8–9; Doc. 93 at 9; Doc. 98-3 at 3–5].  In the Motion for Summary Judgment, Defendant refers to what was previously designated as "Spreadsheet Number 4" as the "Guardian Broker List."  [Doc. 98 at ¶¶ 4, 9].  In his Response, Mr. Snyder does not employ these short-hand references; instead, he uses generic terms such as "Texas list," "Utah-specific broker list," or "national list," without clearly explaining what he refers to.  *See, e.g.*, [Doc. 105 at ¶¶ 35–40].  At oral argument, the Court asked Plaintiff to clarify the specific nature of his misappropriation claims

25:17–26:4].  On that same day, at 1:55 P.M., Mr. Snyder sent an email from his Guardian email address to his personal email address with the Guardian Broker List attached.  [Doc. 98 at ¶ 8; Doc. 105 at ¶ 8; Doc. 92].  All of the information on Spreadsheet Number 4 came from Siebel.  [Doc. 98 at ¶ 6; Doc. 105 at ¶ 6; Doc. 98-3 at 4; Doc. 98-2 at 25:17–26:4].[7]  Spreadsheet Number 4's metadata reveals that Spreadsheet Number 4 was last modified three minutes after it was created.  [Doc. 98 at ¶ 7; Doc. 105 at ¶ 7; Doc. 99-2 at 1].[8]

Guardian terminated Mr. Snyder's employment on August 1, 2016.  [Doc. 98 at ¶ 12; Doc. 105 at ¶ 12; Doc. 99-4 at 2].  Mr. Snyder was unemployed from August 2016 through at least July 2018.  [Doc. 98 at ¶ 13; Doc. 105 at ¶ 13; Doc. 98-2 at 33:20–22].  On August 1, 2018, Beam offered Mr. Snyder a position as a Regional Director of Broker Success.  [Doc. 98 at ¶ 14; Doc. 105 at ¶ 14; Doc. 98-8 at 1].  Mr. Snyder accepted the offer.  [Doc. 98 at ¶ 23; Doc. 105 at ¶ 23; Doc. 98-2 at 66:15–16].  At the time of the employment offer, Mr. Snyder lived in Arizona, but

---

and explain what, exactly, he claims has been misappropriated.  Plaintiff clarified that it is his position that Spreadsheet Number 4 was misappropriated by Beam, but that Plaintiff is not seeking damages based on Texas, Colorado, or Utah broker contacts contained in Spreadsheet Number 4.  Despite Mr. Snyder's exclusion of Texas, Colorado and Utah broker contacts, the Court will refer to the subject document as "Spreadsheet Number 4" or the "Guardian Broker List" for purposes of this Order.

[7] Mr. Snyder attempts to deny this assertion by stating: "Deny.  The information in Siebel came from Plaintiff and Guardian's other sales representatives who regularly updated and added information into the Siebel system."  [Doc. 105 at ¶ 6].  But Mr. Snyder does not dispute that the contents of Spreadsheet Number 4 came entirely from the Siebel system.  [*Id.*].  Accordingly, the Court deems this fact undisputed.  *See* Fed. R. Civ. P. 56(e)(2).

[8] Mr. Snyder attempts to dispute this fact by suggesting that "[t]he broker list was last modified by Plaintiff on September 10, 2018," directing the Court to the metadata associated with Spreadsheet Numbers 8 and 10.  [Doc. 105 at ¶ 7].  However, he directs the Court to no evidence creating a genuine dispute of fact as to when *Spreadsheet Number 4* was last modified.  Furthermore, the Court questioned Plaintiff at oral argument as to the relevancy of the metadata associated with spreadsheets other than Spreadsheet Number 4; Plaintiff conceded that for purposes of determining ownership of Spreadsheet Number 4, when he last modified Spreadsheet Numbers 8, 9, or 10 would be irrelevant.  Accordingly, the Court deems this fact undisputed.  Fed. R. Civ. P. 56(e)(2).

the Parties executed a Relocation Agreement and Beam provided Mr. Snyder a $30,000 moving allowance to move to Colorado.  [Doc. 98 at ¶¶ 19–20; Doc. 105 at ¶¶ 19–20; Doc. 105-6 at 1].

On September 18, 2018, Mr. Snyder sent a spreadsheet referred to in this litigation as "Spreadsheet Number 8" to a Beam employee.  [Doc. 98 at ¶ 35; Doc. 105 at ¶ 35; Doc. 98-2 at 150:6–13].  This spreadsheet contains three separate tabs: "output(1)," "Sheet2," and "Sheet1."  [Doc. 98 at ¶ 36; Doc. 105 at ¶ 36; Doc. 98-2 at 168:3–11].  The "output(1)" tab contains 58,458 broker contacts from all 50 states; the "Sheet2" tab contains 3,375 broker contacts—3,374 from Texas and one from Utah (the "Texas broker list"); and the "Sheet1" tab contains 1,242 broker contacts from Colorado.  [Doc. 98 at ¶ 36; Doc. 105 at ¶ 36; Doc. 98-2 at 169:13–21, 172:24–173:4].  The 58,458 lines of data in the "output(1)" tab come directly from the Guardian Broker List, though Spreadsheet Number 8's "output(1)" tab omits 14 "Guardian-specific columns" of data.  [Doc. 98 at ¶ 37; Doc. 105 at ¶ 37; Doc. 98-2 at 25:17–26:4; 174:20–175:9].  Mr. Snyder intended to send the Texas broker list to Beam but did not intend to include Spreadsheet Number 4 as a separate tab.  [Doc. 105 at ¶ 35; Doc. 98-2 at 150:6–13].[9]  Mr. Snyder did not mark Spreadsheet Number 8 as confidential, limit Beam's access to it, inform Beam it was a trade secret, or protect it with a password.  [Doc. 98 at ¶ 38; Doc. 105 at ¶ 38; Doc. 98-2 at 170:5–172:9].

---

[9] In response to Defendant's statement that "Plaintiff asserts that he accidentally sent [Spreadsheet Number 8] to Beam," [Doc. 98 at ¶ 35], Plaintiff clarifies that he did not accidentally send Spreadsheet Number 8, but accidentally included Spreadsheet Number 4 on a separate tab contained in Spreadsheet Number 8.  [Doc. 105 at ¶ 35].  Defendant does not address Plaintiff's clarification in its Reply.  *See generally* [Doc. 111].  The undersigned's Uniform Civil Practice Standards state that in a reply brief, the party seeking summary judgment "shall include any factual reply it cares to make regarding the facts asserted in its motion to be undisputed, supported by specific references to material in the record."  Civ. Practice Standard 7.1D(6)(A).  Because Defendant does not respond to Plaintiff's assertion, the Court deems this fact undisputed for purposes of the Motion.  *See* Fed. R. Civ. P. 56(e)(2).

Similar events transpired with respect to Spreadsheet Number 9, which contained a Utah broker list, and Spreadsheet Number 10, which contained a Colorado broker list. [Doc. 98 at ¶¶ 40–42, 45–47; Doc. 105 at ¶¶ 40–42, 45–47; Doc. 98-2 at 150:6–13, 156:16–18]. Spreadsheet Numbers 9 and 10 each contained the same "output(1)" tab that contained the contacts directly from Spreadsheet Number 4. [Doc. 98 at ¶¶ 41–42, 46–47; Doc. 105 at ¶¶ 41–42, 46–47; Doc. 98-2 at 154:23–155:11, 156:6–13, 179:19–180:20, 182:11–19]. Mr. Snyder intended to send the Utah broker list and Colorado broker list to Beam, but did not intend to include Spreadsheet Number 4 in a separate tab. [Doc. 105 at ¶¶ 40, 45; Doc. 98-2 at 147:11–21, 150:6–13].[10] Mr. Snyder did not communicate to Beam that Spreadsheet Numbers 9 and 10 were confidential, did not refer to the Spreadsheets as a trade secret, and did not protect these Spreadsheets with a password. [Doc. 98 at ¶¶ 43–44, 48–49; Doc. 105 at ¶¶ 43–44, 48–49; Doc. 98-2 at 164:7–20, 178:17–14, 182:6–183:17]. Beam was not able to access any of the Spreadsheets at issue in this case until Mr. Snyder sent Spreadsheet 8 to Beam. [Doc. 108 at ¶ 58; Doc. 111 at 4 n.4; Doc. 105-11 at 2].

After Mr. Snyder became aware that he had transmitted the Guardian Broker List to Beam, Mr. Snyder did not object to Beam's use of the broker contacts or attempt to claw back the materials. [Doc. 98 at ¶¶ 54–55; Doc. 105 at ¶¶ 54–55; *see generally* [Doc. 91-4]. In addition, Mr. Snyder did not request that Beam return the data or inform Beam that the data was a trade secret. [Doc. 98 at ¶ 56; Doc. 105 at ¶ 56]; *see generally* [Doc. 91-4]. Beam terminated Mr. Snyder's employment on November 6, 2018. [Doc. 98 at ¶ 29; Doc. 105 at ¶ 29; Doc. 98-11 at 15, 20].

Mr. Snyder initiated this lawsuit on October 30, 2020 and filed an Amended Complaint on February 9, 2021. *See* [Doc. 1; Doc. 23]. Mr. Snyder asserts the following claims against Beam:

---

[10] *See supra* note 9.

(1) misappropriation of trade secrets in violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836 ("DTSA") ("Claim One"); (2) misappropriation of trade secrets under the Colorado Uniform Trade Secrets Act, Colo. Rev. Stat. § 7-74-101 ("CUTSA") ("Claim Two"); (3) a claim for obtaining workmen by misrepresentation under Colo. Rev. Stat. § 8-2-104 ("Claim Three"); (4) fraudulent misrepresentation ("Claim Four"); and (5) promissory estoppel ("Claim Five").[11] [Doc. 23 at 24–31]. On November 11, 2022, Defendant filed the instant Motion for Summary Judgment, seeking judgment in its favor on all claims. [Doc. 98 at 1]. This matter is fully briefed, *see* [Doc. 108; Doc. 111], and the Court addresses the Parties' arguments, including those arguments and clarifications made during oral argument, below.

## ANALYSIS

Defendant moves for summary judgment in its favor on each of Plaintiff's claims. First, it contends that it is entitled to judgment on Claims One and Two because (1) there is no evidence that Plaintiff owned the Guardian Broker List/Spreadsheet Number 4; (2) there is no evidence that Beam misappropriated any trade secret; and (3) Plaintiff did not take reasonable measures to protect the trade secrets. [Doc. 98 at 11–19]. Then, it maintains that, based on its affirmative defense of unclean hands, Plaintiff cannot succeed on Claims Four or Five. [*Id.* at 20]. And finally, Beam argues that Claim Three must fail because (1) Plaintiff was unemployed at the time he accepted Beam's offer of employment, such that Colo. Rev. Stat. § 8-2-104 is inapplicable; and (2) there is no evidence that Beam improperly induced Plaintiff to move to Colorado. [*Id.* at 20–21]. The Court addresses Defendant's arguments below.

---

[11] The Court notes that the numbering of the claims in this Order is slightly different than the Court's numbering used in the order on the Motion to Dismiss. *See* [Doc. 46 at 5]. In his Amended Complaint, Mr. Snyder also asserted a negligent misrepresentation claim, which was dismissed by this Court when ruling on Defendant's Motion to Dismiss. *See* [*id.* at 33].

## I.     Trade Secret Misappropriation

Mr. Snyder's first two claims are based on an alleged misappropriation of trade secrets.  To

succeed on a misappropriation claim under the federal DTSA, a plaintiff must establish:

> (1) the existence of a trade secret that relates to a product or service used in, or
> intended for use in, interstate or foreign commerce; (2) the acquisition of the trade
> secret, or the use or disclosure of the trade secret without consent; and (3) the person
> acquiring, using, or disclosing the trade secret knew or had reason to know that the
> trade secret was acquired by improper means.

*DTC Energy Grp., Inc. v. Hirschfeld*, 420 F. Supp. 3d 1163, 1175 (D. Colo. 2019).  The DTSA

defines "trade secret" to include "all forms and types of financial, business, scientific, technical,

economic, or engineering information, including . . . compilations" so long as "the owner thereof

has taken reasonable measures to keep such information secret" and "the information derives

independent economic value, actual or potential, from not being generally known to," or

ascertainable by, another person.  18 U.S.C. § 1839(3).

Similarly, to succeed on a misappropriation claim arising under CUTSA, the plaintiff must

demonstrate "[1] that he or she possessed a valid trade secret, [2] that the trade secret was disclosed

or used without consent, and [3] that the defendant knew, or should have known, that the trade

secret was acquired by improper means."  *Gates Rubber Co. v. Bando Chem. Indus., Ltd.*, 9 F.3d

823, 847 (10th Cir. 1993).  CUTSA defines "trade secret" as "the whole or any portion or phase

of any scientific or technical information, design, process, procedure, formula, improvement,

confidential business or financial information, listing of names, addresses, or telephone numbers,

or other information relating to any business or profession which is secret and of value."  Colo.

Rev. Stat. § 7-74-102(4).  It "may consist of any . . . compilation of information which is used in

one's business, and which gives him an opportunity to obtain an advantage over competitors who

do not know or use it."  *Gold Messenger, Inc. v. McGuay*, 937 P.2d 907, 911 (Colo. App. 1997)

(quoting *Mgmt. Recruiters of Boulder, Inc. v. Miller*, 762 P.2d 763, 765 (Colo. App. 1988)).  To constitute a trade secret, "the owner thereof must have taken measures to prevent the secret from becoming available to persons other than those selected by the owner to have access thereto for limited purposes."  *Id.*

This Court has previously concluded that "ownership is a required element of a trade secret misappropriation claim under both the DTSA and the CUTSA."  *RV Horizons, Inc. v. Smith*, No. 18-cv-02780-NYW, 2020 WL 6701119, at *24 (D. Colo. Nov. 13, 2020).  Indeed, the DTSA expressly provides a cause of action for trade secret misappropriation to *owners* of trade secrets: "*An owner* of a trade secret that is misappropriated may bring a civil action under this subsection if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce."  18 U.S.C. § 1836(b)(1) (emphasis added); *see also Select Energy Servs., Inc. v. Mammoth Energy Servs., Inc.*, No. CIV-19-28-R, 2019 WL 1434586, at *3 (W.D. Okla. Mar. 29, 2019) ("[DTSA] permits an owner to recover for the 'misappropriation' of a trade secret, which includes both acquisition, disclosure, and use of such."); *id.* at *4 (dismissing DTSA claim under Rule 12(b)(6) for failure to allege trade-secret ownership).

With respect to CUTSA, the statute defines "trade secret" by referencing the owner of such. *See* Colo. Rev. Stat. § 7-74-102(4) ("To be a 'trade secret' the owner thereof must have taken measures to prevent the secret from becoming available to persons other than those selected by the owner to have access thereto for limited purposes."); *see also RMS Software Dev., Inc. v. LCS, Inc.*, No. 01-96-00824-CV, 1998 WL 74245, at *4 (Tex. App. Feb. 19, 1998) (applying Colorado law and concluding that only an owner of a trade secret has standing to sue for misappropriation of that secret under CUTSA).  This Court, absent binding authority from the Colorado Supreme Court, has previously predicted that the Colorado Supreme Court would hold that ownership is a

required element of a CUTSA claim. *RV Horizons*, 2020 WL 6701119, at *24. In addition, the Parties to this case agree that ownership is a required element of a CUTSA misappropriation claim. [Doc. 98 at 11; Doc. 105 at 9].[12] Accordingly, Plaintiff must establish that there is at least a genuine issue of material fact that he owned the Guardian Broker List to survive summary judgment.

Beam contends that Mr. Snyder cannot succeed on his CUTSA and DTSA claims because he did not own the Guardian Broker List. *See* [Doc. 98 at 11]. Specifically, Beam argues that Mr. Snyder "has adduced no evidence that [he] owns the Guardian Broker List," and instead, "the evidence in this case demonstrates that Plaintiff misappropriated the Guardian Broker List from Guardian." [*Id.* (emphasis omitted)]. In his Response, Mr. Snyder focuses primarily on the second part of Beam's argument, challenging Beam's position that Mr. Snyder misappropriated the Guardian Broker List from Guardian. *See* [Doc. 105 at 9–11]. However, the Court respectfully disagrees that whether or not the evidence indisputably demonstrates that *Guardian* owned the Guardian Broker List, or that Mr. Snyder misappropriated the Guardian Broker List as a matter of law, is an appropriate framing of the relevant issue. Rather, the issue before the Court is whether a genuine issue of material fact exists as to whether *Mr. Snyder* owned the Guardian Broker List.

---

[12] Some courts have concluded that "one need not be an owner in the traditional sense to bring a misappropriation claim." *Xyngular Corp. v. Innutra, LLC*, No. 2:13-cv-685 TS, 2013 WL 6916525, at *3 (D. Utah Nov. 20, 2013). *See, e.g.*, *Metso Mins. Indus. v. FLSmidth-Excel LLC*, 733 F. Supp. 2d 969, 978 (E.D. Wis. 2010) (concluding that, under Wisconsin law, a non-exclusive licensee can sue for trade secret misappropriation); *DTM Rsch., L.L.C. v. AT & T Corp.*, 245 F.3d 327, 333 (4th Cir. 2001) ("[F]ee simple ownership in its traditional sense is not an element of a trade secrets misappropriation claim in Maryland."); *DaimlerChrysler Servs. v. Summit Nat'l*, No. 02-71871, 2006 WL 1420812, at *8 (E.D. Mich. May 22, 2006) ("[T]he focus is appropriately on the knowledge, or possession, of the trade secret, rather than on mere 'ownership' in the traditional sense of the word."), *aff'd*, 289 F. App'x 916 (6th Cir. 2008). These cases are distinguishable; unlike Colorado law, the applicable state laws in these cases do not define "trade secret" by reference to the owner of the secret. *See* Wis. Stat. § 134.90(1)(c); Md. Code, Com. Law § 11-1201(e); Mich. Comp. Laws § 445.1902(d).

As discussed above, at the summary-judgment stage, the moving party may "point[] out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Adler*, 144 F.3d at 671.  If the movant does so, "the burden shifts to the nonmovant to go beyond the pleadings and set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Id.* (quotation omitted).  Thus, upon Defendant's argument that "Plaintiff has adduced no evidence that Plaintiff owns the Guardian Broker List," [Doc. 98 at 11], the burden shifted to Plaintiff to adduce evidence from which a reasonable jury could conclude that Plaintiff owned the Guardian Broker List, an essential element of Claims One and Two.  *Adler*, 144 F.3d at 671.

In response to Beam's argument, Mr. Snyder contends that "Defendant fails to address the voluminous evidence that . . . demonstrates that there is a question of fact regarding ownership of the spreadsheets."  [Doc. 105 at 11].[13]  Specifically, he maintains that "[t]here is evidence that

---

[13] Mr. Snyder argues that "[t]he Tenth Circuit's opinion in *Ice Corp.* provides the proper framework for assessing the issue of ownership in this case" and contends that the Court must focus on "the parties' conduct, whether there was a written agreement, and the common law hire-to-invent doctrine."  [Doc. 105 at 9].  The Court respectfully disagrees that *ICE Corp.* sets forth any sort of test for determining trade-secret ownership.  In that case, the Tenth Circuit addressed whether the issue of trade-secret ownership had been decided at the trial-court level as a matter of law, making it appropriate for appeal, or a matter of fact, rendering it non-reviewable on appeal due to the defendants' failure to raise a sufficiency-of-the-evidence argument.  *ICE Corp. v. Hamilton Sundstrand Corp.*, 432 F. App'x 732, 737 (10th Cir. 2011).  The Tenth Circuit concluded that it, under the circumstances of that case, ownership was a non-reviewable factual determination made by the jury; in so doing, it rejected the defendants' argument that the trial court's decision at summary judgment that the hired-to-invent doctrine did not apply could be reviewed on appeal, because "[r]egardless of the [lower] court's ruling on the hired-to-invent doctrine, the [trial] court concluded that a reasonable jury could determine ownership based on the parties' conduct and written agreements."  *Id.* at 738.  And because the limited issue submitted to the jury was whether the plaintiff's ownership could be established based on the parties' conduct and written agreements, there was no need to review the lower court's decision on the hired-to-invent doctrine.  *Id.* at 738 n.1.  Thus, the Tenth Circuit's references to the parties' conduct, the existence of agreements, or the hired-to-invent doctrine were made in the context of discussing and rejecting the defendants' arguments; the Tenth Circuit did not articulate any test for determining ownership

Plaintiff created the broker lists, Guardian was aware that Plaintiff had the broker lists, Plaintiff described the process of cultivating the broker list while employed at Guardian for approximately ten years, and Plaintiff described the process of vetting the spreadsheet after his employment at Guardian." [*Id.* (citing Doc. 105-13 at 84:7–19; Doc. 98-2 at 26:24–27:6, 137:5–9, 140:6–9, 188:4–17; Doc. 98-3)].[14]  Plaintiff cites to no legal authority in support of his argument that this evidence demonstrates his ownership of the trade secrets. *See generally* [*id.*].  For the reasons that follow, the Court concludes that Plaintiff has failed to adduce sufficient evidence to create a genuine dispute of material fact as to whether he owns the Guardian Broker List.

The Court's analysis begins with the undisputed facts and evidence.  It is undisputed that Mr. Snyder downloaded the contents of Spreadsheet Number 4 from Guardian's CRM software, Siebel. [Doc. 98 at ¶¶ 4–5; Doc. 105 at ¶¶ 4–5; Doc. 92; Doc. 98-2 at 25:17–26:4].  Furthermore, it is undisputed that *all* of the information contained in Spreadsheet Number 4 came from Siebel. [Doc. 98 at ¶ 6; Doc. 105 at ¶ 6; Doc. 98-3 at 4; Doc. 98-2 at 25:17–26:4].  It is undisputed that Spreadsheet Number 4 was last updated three minutes after it was created.  [Doc. 98 at ¶ 7; Doc. 105 at ¶ 7; Doc. 99-2 at 1].  And finally, it is undisputed that Mr. Snyder forwarded Spreadsheet Number 4 from his Guardian email address to his personal email address, [Doc. 98 at ¶ 8; Doc. 105 at ¶ 8; Doc. 92], and eventually accidentally included what is essentially the entirety of Spreadsheet Number 4 on emails sent to Beam employees.  [Doc. 105 at ¶¶ 35, 40, 45; Doc. 98-2 at 147:11–21, 150:6–13].

---

of trade secrets.  *See id.* at 738–39.  No Party has cited any other legal authority discussing the relevant considerations in determining trade-secret ownership.  *See* [Doc. 98; Doc. 105].

[14] Insofar as Plaintiff asserts that he has adduced evidence in which he "described the process of vetting the spreadsheet after his employment at Guardian," *see* [Doc. 105 at 11], none of the evidence cited by Plaintiff in support of this proposition describes any "vetting" of Spreadsheet Number 4 Plaintiff conducted after his employment with Guardian ended.  *See* [Doc. 105-13 at 84:7–19; Doc. 98-2 at 26:24–27:6, 137:5–9, 140:6–9, 188:4–17].

Mr. Snyder nevertheless contends that he owns the Guardian Broker List.  In support, he first directs the Court to evidence describing how Spreadsheet Number 4 was created.  In his interrogatory responses, Mr. Snyder explained:

> Plaintiff created [Spreadsheet Number 4] while he was employed by Guardian. When Mr. Snyder was hired by Guardian in approximately December of 2006, he began contributing information into Guardian's sales software system, Siebel.  Mr. Snyder, along with other sales employees, regularly provided new information directly into Siebel or to their assistants who would then update the information in Siebel.  Over the course of approximately ten years, on a near daily-basis, Mr. Snyder updated information by inputting new client information into Siebel.  For example, Mr. Snyder regularly updated or added new broker names, broker firms, email addresses, work phone numbers, cell phone numbers, fax numbers, regional data, website information, information related to the production tier of brokers, and various other critical information used to introduce and sell dental insurance through brokers throughout the United States.
>
> In approximately 2015, Guardian decided to change its sales software from Siebel to Salesforce.  To migrate the sales [data], Mr. Snyder had to download the raw sales data from Siebel to an excel spreadsheet.  After downloading the raw data into spreadsheets, Mr. Snyder then had to "scrub" the raw data by combing through the spreadsheet(s) to ensure that the data was up to date, and in this case, formatted correctly to be uploaded to Salesforce.  Mr. Snyder spent at least six[ ]months scrubbing the raw data produced by Guardian's Siebel sales software.  Mr. Snyder created [Spreadsheet Number 4] from the "scrubbed" excel spreadsheets which were created from the raw [data] that was generated by Guardian's Siebel software.

[Doc. 98-3 at 4].  He also stated the following during his deposition:

> Q.    And where -- who put [the data in Spreadsheet Number 4] into Siebel?
>
> . . .
>
> A.    It was -- it was a -- kind of fluid, it was changing all the time.  When I would add or -- when a sales rep in our office, or anywhere in the country, would add an agent, at least in our office it was -- the information was given to an administrative person and they entered it.

[Doc. 98-2 at 26:24–27:6].  Mr. Snyder does not direct the Court to any evidence demonstrating how much of the information in Siebel was attributable to him or how many of the broker contacts he developed himself.  At oral argument, Plaintiff clarified that he personally developed only a

"small fraction" of the approximately 58,000 broker contacts in the Guardian Broker List and conceded that with respect to "most" of the broker contacts, he did not develop them, did not put them into any spreadsheet, and did not input them into the Siebel database.  Nor is it clear from the evidence adduced by Mr. Snyder how many of the contacts outside of Texas, Colorado, and Utah, which are no longer at issue for the purposes of this case, are attributable to him at all.

Insofar as Plaintiff's ownership argument is based on his position that he owns Spreadsheet Number 4 because he—along with an unknown number of other sales employees and administrative personnel employed by Guardian—updated the broker contacts in Siebel during their employment with Guardian and that the contacts were eventually downloaded by Mr. Snyder and put into Spreadsheet Number 4, this is insufficient to establish a genuine issue of fact with respect to his ownership.  Mr. Snyder does not clearly articulate or provide evidence as to which or how many contacts he contributed or whether these contacts are contained in Spreadsheet Number 4, *see generally* [Doc. 105], and does not explain why his contribution of developed contacts—which he concedes was minimal—renders him the owner of the *entirety* of the contents of Spreadsheet Number 4.  [*Id.*].  Nor does Plaintiff cite any legal authority discussing ownership of trade secrets in such circumstances—jointly with Guardian or independently from Guardian— and the Court could locate no case law supporting Plaintiff's theory in its independent research. *Cf. Jamison v. Olin Corp.-Winchester Div.*, No. 03-1036-KI, 2005 WL 7213837, at *6 (D. Or. Oct. 4, 2005) (finding an argument that "any contribution, no matter how small, to a confidential joint development project results in joint ownership of all resulting confidential information by all arms-length . . . collaborators" to be based on "a very dubious legal principle"), *report and recommendation adopted*, 2005 WL 2897036 (D. Or. Nov. 3, 2005).

Second, to the extent that Plaintiff's argument is based on a contention that he owns Spreadsheet Number 4 because it is a compilation of contact information that he spent significant time culling and/or creating, this contention is not supported by the evidence in the record. "A trade secret includes compilations of data that the owner has taken steps to keep secret and that derive independent economic value." *N. Am. Deer Registry, Inc. v. DNA Sols., Inc.*, No. 4:17-cv-00062, 2017 WL 2402579, at *7 (E.D. Tex. June 2, 2017); *see also* 18 U.S.C. § 1839(3); *Gold Messenger*, 937 P.2d at 911. "The rationale for protecting compilations as trade secrets is that the act of compiling entails the investment of time and resources; it is that investment the law seeks to protect." *Ozburn-Hessey Logistics, LLC v. 721 Logistics, LLC*, 13 F. Supp. 3d 465, 474 (E.D. Pa. 2014). Indeed, "[c]ompilations are valuable, not because of the quantum of secret information, but because the expenditure of time, effort, and expense involved in its compilation gives a business a competitive advantage." *AvidAir Helicopter Supply, Inc. v. Rolls-Royce Corp.*, 663 F.3d 966, 972 (8th Cir. 2011).

Here, Plaintiff stated in his interrogatories that he (1) downloaded the raw broker data from Siebel; (2) "'scrub[bed]' the raw data by combing through the spreadsheet(s) to ensure that the data was up to date[] and . . . formatted correctly to be uploaded to Salesforce," which he contends took "at least" six months; and (3) created Spreadsheet Number 4 from the "'scrubbed' excel spreadsheets." [Doc. 98-3 at 4]. Plaintiff does not provide any additional detail explaining this "scrubbing" process. *See generally* [Doc. 105]. Mr. Snyder also offers no authority that the formatting and "scrubbing" of already-compiled information somehow confers ownership to him of that data. At best, Mr. Snyder contends that he downloaded raw data from Guardian, for the purposes of migrating Guardian's data to a new CRM system, and put that data into Spreadsheet Number 4 after verifying the accuracy and formatting of the data. He does not argue, or provide

any evidence demonstrating, that he did anything other than double-check the accuracy and formatting of the information, or that the information contained in Spreadsheet Number 4 is different than the information contained in Siebel; indeed, it is undisputed that the information in Spreadsheet Number 4 came from Siebel. *See generally* [Doc. 105]; *cf. Select Energy Servs., Inc.*, 2019 WL 1434586, at *4 (finding that the plaintiffs had inadequately alleged a DTSA claim based on rig schedules because they failed to allege that they owned the schedules at issue or the information contained therein, which were provided by the plaintiffs' clients).

In addition, it is well settled that "[t]he user of another's trade secret is liable even if he uses it with modifications or improvements upon it effected by his own efforts, so long as the substance of the process used by the actor is derived from the other's secret." *Bimbo Bakeries USA, Inc. v. Sycamore*, No. 2:13-CV-00749 DN, 2017 WL 3089011, at *5 (D. Utah July 20, 2017) (quoting *In re Innovative Constr. Sys., Inc.*, 749 F.2d 875, 887 (7th Cir. 1986)), *aff'd*, 29 F.4th 630 (10th Cir. 2022); *see also Caudill Seed & Warehouse Co. v. Jarrow Formulas, Inc.*, 53 F.4th 368, 384–85 (6th Cir. 2022) ("[I]f a trade secret misappropriator could avoid liability by changing a few details in their final product, the protections that law provides would be hollow indeed." (quotation omitted)). If a person can be held liable for trade secret misappropriation for using a modified version of a trade secret, it necessarily follows that a person does not obtain ownership over another's property simply by modifying it. Plaintiff has not directed the Court to any legal authority demonstrating that ownership attaches when an employee reviews company data to double-check its accuracy and formatting, *see generally* [Doc. 105], and the Court could not locate any such authority. Accordingly, Mr. Snyder's evidence related to his creation of Spreadsheet Number 4 does not demonstrate a genuine issue of material fact with respect to ownership over its contents; even drawing all reasonable inferences in Plaintiff's favor, no reasonable jury could

conclude that he owns Spreadsheet Number 4 because he double-checked the accuracy and formatting of the information in that Spreadsheet.

In addition, Mr. Snyder contends that there is evidence of ownership in that "Guardian was aware that Plaintiff had the broker lists." [Doc. 105 at 11]. In support, Plaintiff cites the following evidence:

> Q.    Did you have permission from Guardian to forward the spreadsheet to your Hotmail account?
>
> . . .
>
> A.    Yes.
>
> Q.    Who gave you that permission?
>
> A.    I don't remember.

[Doc. 98-2 at 137:5–12].

> Q.    Did you ever tell anyone at Guardian that you had forwarded [Spreadsheet Number 4] to your Hotmail account?
>
> A.    Yes.
>
> Q.    Do you recall who?
>
> A.    No.

[*Id.* at 140:6–11]. In reviewing this evidence, the Court does not pass on the strength of this evidence, but concludes that no reasonable jury, even crediting this evidence, could find that Plaintiff owned Spreadsheet Number 4 based on Guardian's purported knowledge of, and grant of permission related to, Mr. Snyder's possession of the Guardian Broker List.

Notably, Plaintiff cites no legal authority suggesting that Guardian permitting Mr. Snyder to forward Spreadsheet Number 4 to his personal email address demonstrates that Mr. Snyder owned Spreadsheet Number 4. *See* [Doc. 105 at 9–11]. In fact, such permission would seemingly

cut *against* finding ownership, as permission necessarily implies that it was Guardian, not Plaintiff, that exercised control and authority over the Guardian Broker List.  *See Permission*, Webster's Third New Int'l Dictionary, 1683 (1993) (defining "permission" as "the act of permitting : formal consent : authorization"); *cf. Advanced Fluid Sys., Inc. v. Huber*, 958 F.3d 168, 179 (3d Cir. 2020) ("Ownership of a trade secret – or any intellectual property for that matter – undoubtedly imbues the owner with the authority to give others lawful possession, including by merely consenting to that possession.").  If Plaintiff did indeed own Spreadsheet Number 4, it is unclear why he would need to obtain permission from Guardian to forward his own trade secrets to himself.  Nor is the fact that Plaintiff possessed Spreadsheet Number 4 sufficiently indicative of ownership to permit a reasonable jury to find in Plaintiff's favor on this issue.  *See Varo, Inc. v. Corbin Mfg. Co.*, 50 F.R.D. 376, 378 (E.D. Pa. 1970) (noting that "[m]ere possession is insufficient to establish the fact of ownership").

Finally, Plaintiff suggests a genuine issue of material fact exists as to trade-secret ownership because there is evidence that Plaintiff "created the broker lists."  [Doc. 105 at 11].  In his deposition, Mr. Snyder stated that "[t]he national broker list was authored by [him]" and stated that it was "correct" that "[he was] the author of the national broker list."  [Doc. 105-13 at 84:11–19].  In addition, he stated as follows:

> Q.   All right.  This is what we're marking as Exhibit 14.  And for the record, we've opened up what's entitled Guardian broker list.xlsx [e.g., Spreadsheet Number 4] as Exhibit 14.  Do you recognize this document, Mr. Snyder?
>
> A.   Yes, I do.
>
> Q.   And what is this document?
>
> A.   This is my list.
>
> Q.   When you say "my list," what do you mean?

> A.    This is the list that I created.  The A and B producing broker list, we referred to it as the national broker list, but this is the list that I created.

[Doc. 98-2 at 188:4–17].

As mentioned above, however, it is undisputed that the entirety of the contents of Spreadsheet Number 4 came from Siebel, and it is Plaintiff's position that he originally downloaded this data for purposes of transferring the information from Siebel to a new CRM system.  Mr. Snyder's act of downloading data from Guardian's CRM system and then, after checking the formatting and accuracy of that data, putting it into Spreadsheet Number 4—with nothing more—is insufficient to establish ownership of that data.  Indeed, courts have long recognized that the "general perception of trade secrets as property is consonant with a notion of 'property' that extends beyond land and tangible goods and includes the products of an individual's 'labour and invention.'"  *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002–03 (1984) (citations omitted).

Nor is Plaintiff's subjective contention that he owns Spreadsheet Number 4 sufficient to establish ownership, absent any objective, corroborating evidence.  *See Frontrange Sols. USA, Inc. v. Newroad Software, Inc.*, 505 F. Supp. 2d 821, 830 (D. Colo. 2007) (finding self-serving assertions that were not supported in the record by corroborating evidence are insufficient to create a genuine question of material fact precluding summary judgment (citing *Salguero v. City of Clovis*, 366 F.3d 1168, 1177 n. 4 (10th Cir. 2004)).  To be clear, the Court cannot and does not weigh the strength or credibility of Mr. Snyder's testimony that he is the owner of Spreadsheet Number 4.  "To reject testimony because it is unsubstantiated and self-serving is to weigh the strength of the evidence or make credibility determinations—tasks belonging to the trier of fact." *United States v. $100,120*, 730 F.3d 711, 717 (7th Cir. 2013).  But even taking Mr. Snyder's

testimony as true, the "[m]ere assertion of a claim of ownership . . . does not establish the fact of ownership." *Varo, Inc.*, 50 F.R.D. at 378.

In sum, even viewing the evidence in the light most favorable to Mr. Snyder, he has not directed the Court to evidence from which a reasonable jury could conclude that he owned Spreadsheet Number 4, a necessary element of his misappropriation claims. For this reason, he cannot succeed on Claims One and Two. The Motion for Summary Judgment is thus **GRANTED** with respect to these claims.

## II.     Obtaining Workmen by Misrepresentation

The Court next addresses the Parties' arguments with respect to Plaintiff's claim under Colo. Rev. Stat. § 8-2-104, which prohibits "obtaining workmen by misrepresentation." This statute makes it unlawful for any person or corporation to "induce, influence, persuade, or engage workmen to change from one place of employment to another in this state, or to bring workmen of any class or calling into this state to work in any of the departments of labor in this state" using false representations, false advertising, or false pretenses. Colo. Rev. Stat. § 8-2-104.

### A.     Statutory Interpretation

Beam first argues that Mr. Snyder cannot prevail on his claim under § 8-2-104 because he was unemployed at the time Beam made its offer of employment. [Doc. 98 at 20–21]. In support of this argument, Beam substantially relies on *Schur v. Storage Tech. Corp.*, 878 P.2d 51 (Colo. App. 1994). Defendant acknowledges in a footnote that *Schur* "did not directly address this issue," [Doc. 98 at 21 n.7], but in its Reply, characterizes Schur as an "on-point interpretation" of § 8-2-104 and asserts that the Court should not "deviate from [*Schur*'s] holding." [Doc. 111 at 10].

In *Schur*, the Colorado Court of Appeals, recounting the procedural history of the case, stated: "[t]he trial court determined, before trial, that, because plaintiff was unemployed at the time

defendant's offer of employment was made to him, he was not a 'workman' under § 8-2-104; thus, it dismissed the claim based upon that statute." *Schur*, 878 P.2d at 53. But notably, the *Schur* court *expressly declined* to address any argument concerning the definition of "workmen" under the statute, finding such arguments immaterial to resolution of the case:

> Section 8-2-104 prohibits the bringing of "workmen" into this state "by means of false or deceptive representations." Because there were no false or deceptive representations made by defendant, plaintiff failed to establish any violation of this statute, irrespective of the definition that might be placed upon the term "workmen." Hence, the trial court committed no error in dismissing the plaintiff's statutory claim.

*Id.* at 56. Contrary to Defendant's assertions, there was no "holding" in *Schur* related to the statute's definition of "workmen," and the Court is not persuaded that *Schur* provides any dispositive guidance to the question before the Court.

In Plaintiff's Response, he contends that the statute provides for recovery in two different scenarios: (1) when an employer induces a person to change from one place of employment to another within this state; *or* (2) when an employer brings workmen of any class or calling into this state from out of state. [Doc. 105 at 20]. Plaintiff contends that he "clearly falls within the second scenario as Plaintiff lived in Arizona when he accepted Defendant's offer to relocate him to Colorado for work." [*Id.*].

This Court could locate no Colorado authority specifically interpreting § 8-2-104 and thus must conduct its own interpretation of the statute. The Court's goal in interpreting a Colorado statute is to ascertain and give effect to the Colorado General Assembly's legislative intent. *Lewis v. Taylor*, 375 P.3d 1205, 1209 (Colo. 2016). The Court looks first to the plain language of the statute, and if that language is clear, the Court's analysis ends there. *In re J.N.H.*, 209 P.3d 1221, 1223 (Colo. App. 2009). But if the statutory text is ambiguous, the Court may look to other tools of statutory interpretation, such as legislative history, to ascertain the legislature's intent. *Crow v.*

*Penrose-St. Francis Healthcare Sys.*, 169 P.3d 158, 165 (Colo. 2007).  The Court "will not adopt a construction that renders any term superfluous or leads to an unreasonable or absurd conclusion," and instead "interpret[s] a statute so as to give all of its parts 'consistent and sensible effect' within the statutory scheme."  *J.N.H.*, 209 P.3d at 1223 (quoting *Richmond Am. Homes of Colo., Inc. v. Steel Floors, LLC*, 187 P.3d 1199, 1204 (Colo. App. 2008)).

Section 8-2-104 prohibits the following conduct: inducing "workmen to change from one place of employment to another in this state, <u>or</u> [bringing] workmen of any class or calling into this state to work in any of the departments of labor in this state."  Colo. Rev. Stat. § 8-2-104 (emphasis added).  While the statute's plain language is not entirely illuminating as to the legislature's intent, the Court notes that the legislature expressly included the phrase "change from one place of employment to another" in the first clause, which demonstrates an intent to prohibit not just inducing a Colorado resident to join a workplace using false representations, but to prohibit inducing a Colorado resident *to leave his or her place of employment* for another workplace using false representations.  In other words, this clause appears to require that the plaintiff be employed at the time of the unlawful inducement.  However, although the legislature could have included the same limiting language in the second clause as well, it did not do so.  Instead, it chose to make it unlawful to bring "workmen of *any class or calling* into this state *to work* in any of the departments of labor in this state."  Colo. Rev. Stat. § 8-2-104 (emphasis added).  "Just as important as what the statute says is what the statute does not say."  *Auman v. People*, 109 P.3d 647, 656 (Colo. 2005).  The Court must "construe the legislature's decision to omit such qualifying language . . . as intentional, and, of course, . . . must refrain from adding words to the statute."  *Mook v. Bd. of Cnty. Comm'rs of Summit Cnty.*, 457 P.3d 568, 576 (Colo. 2020) (citations omitted).

Furthermore, the Court notes that Senate Bill 122, which eventually became § 8-2-104, was titled "[a] bill for an act prohibiting the use of deception, misrepresentation, false advertising and false pretenses and unlawful force in the procuring of employes [sic] to work in any department of labor in this State and fixing penalties, criminal and civil, for violation thereof." S.B. 122, 18th Gen. Assemb. (Colo. 1911). The title of Senate Bill 122 indicates that its purpose was to prohibit the procuring of employees generally by false representations and does not contain any indication that its scope was intended to protect only individuals who are currently employed. *See People v. Zapotocky*, 869 P.2d 1234, 1239 (Colo. 1994) ("A court also may consider the title of the legislation in resolving uncertainties concerning legislative intent.").

The Court thus agrees with Plaintiff that, based on the language of the statute, the legislature did not intend to limit all claims under § 8-2-104 to persons who were employed at the time they were unlawfully induced to join a workplace. *See Nelson v. Gas Rsch. Inst.*, 121 P.3d 340, 343 (Colo. App. 2005) ("Section 8-2-104 prohibits any person from inducing workers to change from one place of employment to another or to bring workers to Colorado by means of false or deceptive representations."). Mr. Snyder's claim is not barred simply because he was unemployed when he accepted Beam's offer of employment.

### B.     The Sufficiency of Plaintiff's Evidence

In the alternative, Beam contends that Mr. Snyder "cannot demonstrate that Beam exerted improper inducement and influence toward" Mr. Snyder to induce him to move to Colorado. [Doc. 98 at 21]. According to Beam, the evidence in this case establishes that Beam initially discussed Mr. Snyder joining Beam in the Arizona region, where Mr. Snyder lived at the time, but that Mr. Snyder requested to move to Colorado. [*Id.*]. Beam concludes that because it did not induce Mr.

Snyder to move to Colorado, "and instead generously agreed to pay for his [moving] expenses," Mr. Snyder cannot succeed on his claim under § 8-2-104. [*Id.*].

Mr. Snyder responds that he "was content staying in Arizona and Defendant paid Plaintiff a $30,000 reimbursement for the move from Arizona to Colorado"; Defendant "offered Plaintiff the [Regional Director] position, as opposed to the [Broker Success Manager], which is the Defendant assigned to Plaintiff [sic]"; and Defendant "promised that in January [2019], his position would change to the National Director of Broker Sales, where [Mr. Snyder] would be responsible for the entire country." [Doc. 105 at 20–21]. Mr. Snyder concludes that this evidence demonstrates that Defendant induced Plaintiff to move to Colorado using false representations. [*Id.* at 21].

In support of its argument, Beam directs the Court to the deposition testimony of an individual named Chase McCants, who stated that "[Mr. Snyder] wanted to move from his home to Colorado because he thought that he could better meet with his clients [in Colorado]" and that moving was not required for the role. [Doc. 98 at 21; *id.* at ¶¶ 16–17; Doc. 98-5 at 169:11–14; Doc. 98-6]. Beam does not identify Chase McCants or explain his connection to Beam or this lawsuit. *See generally* [Doc. 98].[15] Meanwhile, Mr. Snyder directs the Court to evidence that, when negotiating his employment with Beam, he "suggested to Alex Frommeyer that it may be easier from a logistics perspective to have [him] located in a more centralized area to [his] region[,] including Colorado." [Doc. 105-1 at ¶ 6]. According to Plaintiff, there were no further discussions about relocating to Colorado until it was included in his offer letter. [*Id.* at ¶ 7]; *see also* [Doc. 98-

---

[15] Beam also asserts that "Beam did not request for Plaintiff to move to Colorado and had no preference whether Plaintiff lived in Colorado or Arizona." [Doc. 98 at ¶ 17]. This assertion, however, is not supported by the cited evidence. *See* [Doc. 98-4; Doc. 98-5 at 169:8–170:12; Doc. 98-6; Doc. 98-7].

8 (the offer letter offering a $30,000 moving allowance)].  Plaintiff represents in his affidavit that if Beam told him it did not want him to move, he would have stayed in Arizona.  [Doc. 105-1 at ¶ 8].  In addition, the relocation agreement provides that Beam and Mr. Snyder agreed that Mr. Snyder would move from Arizona to Colorado "as a condition of employment by [Beam]."  [Doc. 105-6 at 1].  And finally, Plaintiff directs the Court to evidence that it offered Mr. Snyder a position as a Regional Director of Broker Success, *see* [Doc. 98-8 at 1], but then ultimately assigned him to the role of Broker Success Manager.  [Doc. 105-5 at 1]; *see also* [Doc. 98-2 at 67:17–25 (Mr. Snyder explaining that a regional director is "in charge of an entire region" while a broker success manager "is a sales rep that works in a territory, supervised and guided by the regional director of broker success")].

Mr. Snyder has adduced sufficient evidence, at this juncture, to create a genuine dispute of material fact as to whether Beam improperly induced him to move from Arizona to Colorado through false or deceptive representations.  Accordingly, summary judgment is not appropriate on Claim Three.  The Motion for Summary Judgment is **DENIED** to the extent it seeks judgment in Beam's favor on the § 8-2-104 claim.

### III.   Fraudulent Misrepresentation and Promissory Estoppel

Finally, Beam contends that it is entitled to summary judgment on Plaintiff's fraudulent misrepresentation and promissory estoppel claims based on the doctrine of unclean hands.  [Doc. 98 at 20].  Specifically, it contends that "Plaintiff's illegal acquisition of the Guardian Broker List proves, as a matter of law, Beam's affirmative defense of unclean hands."  [*Id.*].  According to Beam, "[b]ecause Plaintiff misappropriated the Guardian Broker List, a reasonable jury could only find that Plaintiff's equitable/misrepresentation claims are barred by the doctrine of unclean

hands."  [*Id.*].  Plaintiff responds that application of the doctrine of unclean hands is a question of fact that cannot be resolved at summary judgment.  [Doc. 105 at 20].

A defendant bears the burden of establishing an affirmative defense at trial.  *See Leone v. Owsley*, 810 F.3d 1149, 1153 (10th Cir. 2015).  Indeed, "[b]y its nature, an affirmative defense does not negate the elements of a plaintiff's claim, but instead precludes liability even if all of the elements of a plaintiff's claim are proven."  *Lints v. Graco Fluid Handling (A) Inc.*, 347 F. Supp. 3d 990, 1009 (D. Utah 2018).  Thus, to prevail on an affirmative defense at the summary-judgment stage, the defendant has the burden to provide sufficient evidence to demonstrate the absence of disputed facts and for the court to conclude that no reasonable jury could find in the plaintiff's favor.  *Leone*, 810 F.3d at 1153.  "In other words, the evidence in the movant's favor must be so powerful that no reasonable jury would be free to disbelieve it.  Anything less should result in denial of summary judgment."  *Id.* at 1154 (quoting 11 Moore's Federal Practice, § 56.40[1][c] (Matthew Bender 3d Ed. 2015)).

Under the doctrine of unclean hands, "a party engaging in improper or fraudulent conduct relating in some significant way to the subject matter of the cause of action may be ineligible for equitable relief."  *Premier Farm Credit, PCA v. W-Cattle, LLC*, 155 P.3d 504, 519 (Colo. App. 2006) (citing *Salzman v. Bachrach*, 996 P.2d 1263, 1269 (Colo. 2000)).  "Whether the doctrine applies is a mixed question of fact and law that involves an exercise of judicial discretion based on findings of fact."  *Wilson v. Prentiss*, 140 P.3d 288, 293 (Colo. App. 2006).  "Because equitable matters such as this are entirely discretionary, it is within the trial court's discretion to determine not only whether the facts support a finding of unclean hands, but also whether to grant equitable relief based on such a finding."  *Premier Farm Credit*, 155 P.3d at 519.

The Court cannot conclude that Defendant has met its burden to establish that no reasonable jury could find in Plaintiff's favor on the affirmative defense of unclean hands. Defendant cursorily asserts that "Plaintiff misappropriated the Guardian Broker List" and that "Plaintiff's illegal acquisition of the Guardian Broker List proves, as a matter of law, Beam's affirmative defense of unclean hands." [Doc. 98 at 20]. However, the question of whether Mr. Snyder has demonstrated a genuine issue of material fact as to whether he owned Spreadsheet Number 4 is a separate and distinct question from whether he *misappropriated* Spreadsheet Number 4 as a matter of law—a question that is not before the Court in this case. *Cf. Whiting Oil & Gas Corp. v. Atl. Richfield Co.*, 321 P.3d 500, 508 (Colo. App. 2010) (affirming denial of summary judgment on unclean hands defense, even where the plaintiff had breached its duty of good faith and fair dealing, because whether the doctrine of unclean hands applies is a separate inquiry from a breach of duty), *aff'd sub. nom. on other grounds*, *Atl. Richfield Co. v. Whiting Oil & Gas Corp.*, 320 P.3d 1179 (Colo. 2014).

Application of the unclean-hands doctrine requires a showing of *improper* conduct. *Gravina Siding & Windows Co. v. Gravina*, 516 P.3d 37, 47 (Colo. App. 2022). Mr. Snyder has presented evidence that he had Guardian's permission to possess Spreadsheet Number 4 and to send it to his personal email address. [Doc. 98-2 at 137:5–12, 140:6–11]. Beam has presented evidence that Mr. Snyder "took Guardian property without permission" and that Guardian demanded that Mr. Snyder return Spreadsheet Number 4. [Doc. 91-1 at 2]. While the Court concluded that Mr. Snyder's evidence that he had Guardian's permission to possess Spreadsheet Number 4 was insufficient to create a dispute of fact as to his ownership of Spreadsheet Number 4, the Court does not reach the same conclusion with respect to the doctrine of unclean hands. There is a genuine dispute of material fact as to whether Mr. Snyder's possession of Spreadsheet

Number 4 arose from improper conduct, and the Court cannot resolve factual matters at the summary-judgment stage.

The Court's holding is limited to a determination that, at this juncture, Defendant's brief argument is insufficient to permit it to meet its burden to show that a reasonable jury could only find in its favor on its unclean-hands defense. *See Leone*, 810 F.3d at 1153.[16]  Accordingly, the Court will **DENY** the Motion for Summary Judgment with respect to Claims Four and Five. *See Hamric v. Wilderness Expeditions, Inc.*, 6 F.4th 1108, 1122 (10th Cir. 2021) ("To defeat a motion for summary judgment, a plaintiff, upon the defendant raising and supporting an affirmative defense, need only identify a disputed material fact relative to the affirmative defense." (emphasis omitted)).

## IV.    Remaining Matters

Each Party has filed a motion to exclude expert testimony under Rule 702 of the Federal Rules of Evidence. *See* [Doc. 91; Doc. 93].  Beam seeks to exclude the testimony of Mr. Snyder's damages expert, Nicholas Adamy, who is expected to testify as to "economic damages issues arising out of claims related to trade secrets and employment." [Doc. 92-1 at 4; Doc. 91].  Mr. Snyder seeks to exclude testimony from Beam's expert, Sean Gallagher, who is expected to testify as to "whether certain data that Plaintiff John Snyder disclosed at [Beam] should have been viewed as a trade secret by Beam." [Doc. 94 at 1; Doc. 93].

It appears that, in light of this Court's grant of summary judgment in Defendant's favor on Plaintiff's misappropriation claims, a portion of Beam's Rule 702 motion and the entirety of Mr.

---

[16] To be clear, the Court does not intend to suggest that a plaintiff can assert equitable claims based on property that he does not own.  However, Defendant does not make this argument, and instead relies solely on its affirmative defense of unclean hands; because there is a genuine dispute of fact as to an essential element of the defense, summary judgment on the defense is not proper.

Snyder's Rule 702 motion may be moot. **Indeed, Plaintiff is specifically advised that he and his witnesses, including any experts, are precluded from describing or referring to the Guardian Broker List or any Spreadsheets (including Spreadsheet Numbers 4, 8, 9, or 10) as trade secrets.** Accordingly, it is **ORDERED** that on or before **July 3, 2023**, the Parties shall meet and confer with respect to Beam's anticipated use of Mr. Gallagher's testimony at trial, if any, and Mr. Snyder's anticipated use of Mr. Adamy's testimony at trial, if any. The Parties shall also meet and confer with respect to whether the Rule 702 motions have been limited or mooted by the Court's ruling here. It is further **ORDERED** that on or before **July 3, 2023**, the Parties shall file a joint Status Report setting forth their respective positions on these matters, with supporting argument and legal authority if appropriate.

## CONCLUSION

For the reasons set forth herein, **IT IS ORDERED** that:

(1) The Partial Motion for Summary [Doc. 98] is **GRANTED in part** and **DENIED in part**;

(2) The Motion for Summary Judgment is **GRANTED** with respect to Claims One and Two, and judgment will be entered in Defendant's favor on these claims at the conclusion of this case;

(3) The Motion for Summary Judgment is **DENIED** in all other respects; and

(4) On or before **July 3, 2023**, the Parties shall file a joint Status Report, after conferral, addressing the issues relating to the pending Rule 702 motions identified herein.

DATED:  June 22, 2023                                    BY THE COURT:

_____
Nina Y. Wang
United States District Judge